UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAMARCUS FIGGS and DAVID CORBIN ) <br> Et al., individually and on behalf of all others ) <br> Similarly situated ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE GEO GROUP, INC., ) <br> ) <br> Defendant. ) | Case No. 1-18-cv-00089-TWP-MPB |

**MEMORANDUM IN SUPPORT OF THE GEO GROUP, INC.'S REPLY
TO PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM**

Defendant The GEO Group, Inc. ("GEO") files this memorandum in support of its reply to the Plaintiffs' Response In Opposition to Defendant The GEO Group, Inc.'s 12(b)(6) Motion. Dkt. 8, 9 (the "Response" or "Resp."). The Response fails to answer many of the arguments and authorities raised in GEO's memorandum in support of its motion to dismiss, Dkt. 6 ("Mot."), and fails to persuasively explain why any of Plaintiffs' alleged claims are plausible. The Complaint, Dkt. 1 ("Comp."), should be dismissed.

**I.   PLAINTIFFS FAIL TO STATE PLAUSIBLE CLAIMS UNDER THE TRAFFICKING VICTIMS PROTECTION ACT.**

*Plaintiffs' Remedy, If Any, Is In Habeas*.  The gravamen of Plaintiffs' claims under the Trafficking Victims Protection Act ("TVPA") is that they are improperly detained at the Mental Health Unit ("MHU") of the New Castle Correctional Facility (the "Facility").  But Plaintiffs' Response misses the big point: they and their putative class were at GEO's facility because they are convicted prisoners in the custody of the Indiana Department of Correction ("IDOC"), which sent them to the Facility.  GEO does not "hold" or "harbor" or "recruit" or "obtain" prisoners or their labor, or undertake any of the other trafficking actions prohibited by the TVPA; the prisoners are in the legal custody of the State. 18 U.S.C. §§ 1581, 1589, 1590.

1

If the Plaintiffs wish to challenge the validity of their continued confinement at the Facility—and their request for a "transfer" is a telltale sign that this is the gravamen of their Complaint—they should apply for a writ of habeas corpus, rather than sue GEO. "Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus." *Muhammad v. Close*, 540 U.S. 749, 750 (2004). For example, in *Alexander v. CCA*, No. 10-1956, 2010 WL 4723435 (D.D.C. 2010), a Georgia state prisoner confined at a privately operated correctional facility in Georgia alleged that he "was sentenced to do time in the state penal system by court order but [is] being punished again with involuntary servitude[.]" *Id*. at *1. He sought, *inter alia*, "a court order against further violations of the Trafficking Victims Protection Act of 2000" and $10 million in monetary damages for "kidnapping, false imprisonment, force [sic] labor and physical injury." *Id*. at 4. The district court, construing the TVPA claims and other claims as a civil action challenging the conditions of prisoner's confinement, dismissed the case on the grounds that it would need to be filed in a different federal district as a habeas action. Likewise, Plaintiffs' similar claims are appropriate for habeas action against the State of Indiana or IDOC, not a civil suit against GEO.

*The TVPA Provisions Do Not Apply.* The bulk of Plaintiffs' arguments on their TVPA claims is a restatement of statutory language and the Plaintiffs' own allegations, and assumes that the various provisions of the TVPA apply to GEO. Resp. 3-10. This is not enough. As Plaintiffs' own citations underscore, the TVPA was enacted "to ensure just and effective punishment of traffickers, and to protect their victims." Resp. 5 (citing Pub. L. No. 106-386, § 102, 114 Stat. 1488 (2000). Congress made twenty-four separate findings, noting, for example, that "the degrading institution of slavery continues throughout the world," as "[a]t least 700,000 persons annually, primarily women and children, are trafficked within or across international borders" and about "50,000 women and children are trafficked into the United States each year." *Id.* at § 102(b), 22 U.S.C. § 7101(b). Among these findings—***none*** indicate, or even suggest, that Congress intended the TVPA to apply to individuals who are lawfully held in the custody of a state at a privately-operated facility.

GEO is simply not a "trafficker" of the prisoners at the Facility. To "traffic" means "to trade or deal in." Black's Law Dictionary, 8th ed. at 1534. GEO does not "trade or deal in" any prisoners at the Facility. Plaintiffs argue that "they are held by a private company . . . in a privately operated facility by implementation of a scheme designed for Defendant's profit and benefit." Resp. 9. But in no meaningful sense are Plaintiffs and other prisoners "held" by GEO in involuntary servitude the way a trafficker "holds" victims by various means prohibited by the TVPA. IDOC holds inmates in its custody and imprisons them for their crimes after they have been sentenced by Indiana courts, and it chooses to contract with GEO to operate the Facility that houses and cares for the prisoners. IDOC makes all decisions about inmate placements, including evaluations and transfers in and out of the Facility based on mental health status. *See* Mot. at 5-6.

Furthermore, the Response in no way helps to clarify what Plaintiffs' TVPA allegations are. For example, a claim under 18 U.S.C. § 1589 can be pled in a number of ways, but neither the Complaint nor the Response provides any sense of how GEO allegedly forced labor, and by what means prohibited by the statute. Merely underlining portions of the statute or reciting allegations seriatim does not suffice to show why Plaintiffs have plausibly stated a claim under the TVPA upon which relief may be granted. Resp. 4-5, 8-10.

The Colorado district court's decision in *Menocal v. The GEO Group, Inc*., 113 F. Supp. 3d 1125, 1128 (D. Colo. 2015)—which has not yet received an appellate review on the merits—is not binding on this Court, and the Court should not follow it. The *Menocal* court charted an erroneous course by allowing a claim under 18 U.S.C. § 1589 against GEO to survive a motion to dismiss. In doing so, that court contravened a fundamental rule that favors a construction of the statute that "give[s] effect to the intent of Congress." *United States v. Am. Trucking Ass'ns, Inc*., 310 U.S. 534, 542 (1940); *Strackbein v. Wynne*, 282 F. App'x 443, 446 (7th Cir. 2008); *see also Bassiouni v. F.B.I.*, 436 F.3d 712 (7th Cir. 2006). The Supreme Court has long recognized that the literal construction of a statute must give way when such a construction would lead to an "absurd result." *Holy Trinity Church v. United States*, 143 U.S. 457, 458-60 (1892).

In light of the TVPA's overarching purpose, *Menocal* went too far by extending the statute to reach a detention facility operated under a contract with the federal government, housing detainees in the custody of the federal government.  As an extreme example, the Sixth Circuit held that there was no "forced labor" under 18 U.S.C. § 1589 where a defendant's use of child abuse to force child relatives in his care to do household chores, including beating the children with his hands, plunger sticks, ice scrapers, and broomsticks, often for minor oversights or violations of seemingly arbitrary rules, did not constitute "forced labor." *U.S. v. Toviave*, 761 F.3d 623, 628 (6th Cir. 2014) ("[W]e should not—without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime.").  Plaintiffs ask this Court likewise to exceed Congress's intent by interpreting the TVPA to make actionable the alleged requirement for prisoners to perform basic housekeeping chores while in an IDOC contract prison.

*Menocal* also departed from well-established authority that prisoners and detainees may be lawfully required to perform certain housekeeping chores for purposes of institutional maintenance without engaging in "involuntary servitude."  *See*, *e.g.*, *Channer v. Hall*, 112 F.3d 214, 218-19 (5th Cir. 1997) ("We hold that the federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks…"); *Jobson v. Henne*, 355 F.2d 129, 131–32 (2d Cir. 1966) (inmates in mental hospitals can be required to perform housekeeping chores); *Bayh v. Sonnenburg*, 573 N.E.2d 398, 410-12 (Ind. 1991) (reversing $28 million judgment in favor of mental hospital patients who performed work at facilities in the 1970s).  Reading 18 U.S.C. § 1589 as providing a broader reach than the prohibition against involuntary servitude in 18 U.S.C. § 1584 and the Thirteenth Amendment, the *Menocal* court erroneously declined to apply the "civic duty" exception in the context of a privately-operated facility.  *Menocal*, 113 F. Supp. 3d at 1132-33.  This view is mistaken.  Congress passed later enactments affecting the TVPA, such as 18 U.S.C. § 1589, after *Channer*, thereby ratifying the exception

4

recognized in *Channer*. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").[1]

Here, the Court's TVPA determination need not turn on the "civic duty" exception because Indiana *law* expressly provides that prisoners "may be required" to help clean and maintain prison facilities. Ind. Code § 11-10-6-3(a), (b)(1). The statute provides that an inmate should clean his or her own living space, as well as perform "general maintenance work" and provide "assist[ance] in providing other services essential to the administration of the facility…." *Id.* The statute does not differentiate between prisoners housed at State-operated or privately-operated facilities. The provisions of the TVPA certainly cannot be construed to federally criminalize or impose civil liability for a requirement that is expressly authorized by state law. Plaintiffs simply ignore these provisions of state law.[2]

Plaintiffs cite to *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 678-85 (S.D. Tex. 2009), which permitted a TVPA claim to go forward against a federal government contractor acting overseas. This kind of comparison, however, should underscore exactly why the TVPA is not applicable to GEO's operation of the Facility. In the horrendous circumstances of *Adhikari*, which resulted in numerous gruesome deaths, the allegations established that deceased Nepali workers "were misled and deceived into

---

[1] The legislative history further supports the view that Congress did not intend the additional of 18 U.S.C. § 1589 to regulate work at prison facilities. The Joint Explanatory Statement of the Committee of Conference described the TVPA generally as an "Act to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions, in the United States and countries around the world through prevention, through prosecution and enforcement against traffickers, and through protection and assistance to victims of trafficking." Victims of Trafficking and Violence Protection Act of 2000, H.R. Conf. Rep. 106–939 at 88 (Oct. 5, 2000). The managers' discussion of Section 12 of the House Bill, which included Section 1589, was entitled "STRENGTHENING PROSECUTION AND PUNISHMENT OF TRAFFICKERS." *Id.* at 99 (capitalization in original). Section 12, the managers explained, "adds several new criminal violations in the areas of trafficking in persons." *Id.* (emphasis added). Section 1589 was one of these new criminal provisions, "creat[ing] a new crime of forced labor." *Id.* The managers made clear that Section 1589 was not to be a general law regulating labor. In compromising on the language of Section 1589, the managers expressly rejected language from the House Bill that "might have criminalized conduct that is currently regulated by labor law." *Id.* at 101. Rejected were provisions "addressing fraud or deception to obtain labor or services of minors, mentally incompetent persons, or persons otherwise particularly susceptible." *Id.* at 101.

[2] Plaintiffs also ignore GEO's discussion of cases holding the TVPA does not make actionable "adverse but legitimate consequences" to plaintiffs. *See Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012); *see also Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWPTAB, 2015 WL 1396599, at *4 (S.D. Ind. Mar. 25, 2015); Mot. 4-5. GEO is not the reason Plaintiffs and their putative class are in prison, nor did it create the relevant rules. The Indiana legislature determined that prisoners may be required to perform institutional maintenance. Ind. Code § 11-10-6-3.

working in a dangerous area, held in a dark room, had their passports taken away, and were transported against their will along a knowingly dangerous route, all while being told that they could not return to their home country." *Id.* at 684. The allegations plausibly stated that the defendant federal contractor "knew this was occurring ... [and] deliberately formed an enterprise with the purpose of trafficking cheap labor to U.S. military installations in Iraq in order to earn a profit, and that they performed concrete acts to further this purpose." *Id.* This presents an entirely different situation than here, where convicted criminals imprisoned under IDOC's authority are alleged to have been required to perform basic housekeeping tasks that are, in fact, expressly approved by state law.

In sum, the TVPA is an anti-trafficking law, and it was never intended to be applied to government contractors that operate prison facilities, where inmates serve sentences imposed upon them by courts, not as "trafficked" persons allegedly entitled to a wage. In light of the Indiana statutory framework that expressly directs the kind of work of which they complain, Plaintiffs should lose credibility by unsupported and implausible allegations like "[t]he purpose of the operation of the MHU is to create financial benefit and value for Defendant, a for-profit publically [sic] traded corporation." Comp. ¶ 11. This is a lawfully run contract facility carrying out State-appointed duties, not a trafficking scheme.

## II. PLAINTIFFS FAIL TO STATE PLAUSIBLE EIGHTH AND FOURTEENTH AMENDMENT CLAIMS.

*Eighth Amendment*. Plaintiffs' claim turns on the allegation that they are placed in segregation in a manner that constitutes cruel and unusual punishment. Comp. ¶¶ 23-24, 33. However, Plaintiffs simply ignore the authorities cited by GEO, *see* Mot. 11-12, in which the Seventh Circuit has found no Eighth Amendment violation for more prolonged periods of segregation than Plaintiffs allege they have experienced. *Compare* Comp. ¶ 24 (alleging segregation of 20 hours per day) *with Caldwell v. Miller*, 790 F.2d 589, 600-01 (7th Cir. 1986) (no violation for one month of 24 hours per day segregation, and after that, 23 hours per day); *Bono v. Saxbe*, 620 F.2d 609, 613-15 (7th Cir. 1986) (no violation for 23 and 1/2 hours per day segregation). Additionally, the Seventh Circuit has also upheld the shackling of

prisoners when outside of their rooms. *Bono*, 620 F.2d at 613. Plaintiffs simply fail to address these authorities, and fail to plausibly show a sufficiently serious injury.

Depending on the facts, there may be a basis to challenge whether a prison official's segregation practices ensure "minimally adequate mental health care" under the Eighth Amendment. Resp. 14 (quoting *Indiana Prot. and Advocacy Servs. v. Comm. of Dep't of Corr.*, No. 1:08-cv-01317-TWP-MJD, 2012 WL 6738517, at *15-17 (S.D. Ind. Dec. 31, 2012)) ("*IPAS*"). However, the *IPAS* decision was not reviewed by the Seventh Circuit,[3] and the facts alleged differ from what Plaintiffs allege. For example, in *IPAS* the court found that "[a]ll segregation prisoners spend the great majority of their day locked in their cells, up to 22 hours and 45 minutes per day and, for some prisoners, all day." 2012 WL 6738517, at *3. By contrast, Plaintiffs allege they were "locked in small rooms approximately twenty hours per day." Comp. ¶ 24. The alleged amount of time outside the room is a material difference to the facts in the *IPAS* case, and inconsistent with Plaintiffs' forced labor allegations (which allege that GEO sought to "extract the maximum value" from prisoners' labor, Comp. ¶ 25). Therefore, the Court should not hesitate to dismiss the claim.

Plaintiffs provide no plausible basis for concluding that GEO acted with deliberate indifference with respect to segregation. Plaintiffs offer the conclusory assertion that GEO "by its policy, practice, custom or procedure may be liable for so violating the rights of Plaintiffs," Resp. 16, but they do not identify any such policy, practice, custom or procedure that would plausibly establish that GEO acted with deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Notably, Plaintiffs make no Eighth Amendment claim based on the work they claim to have done. The Eighth Amendment "does not apply to inmates in a work environment unless they are required to perform physical labor which is beyond their strength, endangers their lives or health, or causes undue pain." *Burrell v. Loungo*, No. 3:14-CV-01891, 2016 WL 7177549, at *10 (M.D. Pa. July 18, 2016), report and recommendation adopted, No. 3:14-CV-1891, 2016 WL 7175615 (M.D. Pa. Dec. 8, 2016)

---

[3] The lack of appellate review is significant, because the order did not address the Seventh Circuit's precedents in *Caldwell* and *Bono*.

(dismissing Eighth Amendment claim and citing other cases).  Plaintiffs make no allegation that they were required to perform physical labor beyond their strength, or that endangered their life or health, or caused undue pain.  The Complaint alleges that class members are required to perform work such as "cleaning, completing reports, carrying out obligations of Defendant's contracts, and assisting non-disabled employees in various aspects of their work in maintaining the MHU."  Comp. ¶ 19.  They claim the "conditions of labor and confinement" are "harmful," but there is no allegation that the labor is harmful, only that class members are in segregation 20 hours per day (thus minimizing the amount of work done).  *See* Comp. ¶ 24.

*Fourteenth Amendment.*  Plaintiffs do not dispute the core question on their Fourteenth Amendment Equal Protection claim is whether there is a rational basis for any alleged differential treatment of them at the Facility.  *See* Mot. 14-15; Resp. 14; Comp. § 33.  However, Plaintiffs demonstrate that they are incapable of formulating any rationale for an Equal Protection claim, much less a plausible one.  The Complaint simply alleges that GEO "acting under color of [sic] discriminated against named Plaintiffs and putative class members without a reason rationally related to a legitimate governmental interest…"  Comp. ¶ 33.  The Response does nothing to clarify in what respect Plaintiffs believe that they were treated differently, or deprived of equal protection.  GEO and the Court must simply speculate as to what the claim is, and therefore, it must be dismissed.

### III. PLAINTIFFS FAIL TO STATE PLAUSIBLE CLAIMS UNDER THE ADA AND REHABILITATION ACT.

Plaintiffs' claims under the ADA and Rehabilitation Act never get out of the gate because they rely on clearly false premise: Plaintiffs and other class members were never GEO's "employees" and GEO was never a covered "employer" of the prisoners.  *Neisler v. Tuckwell*, 807 F.3d 225, 228 (7th Cir. 2015) ("it is questionable whether a prisoner working at a prison job qualifies as an 'employee' within the meaning of Title I [of the ADA].").  In this respect, the law has developed much as it has under the Federal Labor Standards Act ("FLSA"), where courts have repeatedly held that prisoners in work programs are not employees of their prisons.  *See* Mot. 17 (citing *Smith v. Dart*, 803 F.3d 304, 314 (7th

Cir. 2015); *Bennett v. Frank*, 395 F.3d 409, 410 (7th Cir. 2005)). With regard to the instant claims, the EEOC reached the same conclusion, declining to take action on the ground that the Plaintiffs have no employer-employee relationship with GEO. *See* Mot. Exs. 1 & 2.

Plaintiffs' Response on these points is short and unsatisfactory. Plaintiffs fail to distinguish *Neisler*, or dispel the Seventh Circuit's doubts about whether prisoners are employees under the ADA. Resp. 17. The citation to the EEOC compliance manual is unhelpful, because it addresses a situation "if" a correctional institution is a covered employer, and does not address the underlying question of whether a privately-operated facility is "covered." In any event, the EEOC has stated that prisoners are not "employees" under Title VII, looking to Department of Labor's determination that prisoners are not "employees" under FLSA. *See* EEOC Dec. No. 86–7, 1986 WL 38836, 2 Empl. Prac. Guide (CCH) ¶ 6865, at 7099 (April 18, 1986). While Plaintiffs criticize GEO for looking to clearly analogous FLSA precedents that hold that prisoners are not "employees," they point the Court to inapplicable Title VII cases. *See* Resp. 18. Indeed, the cases cited by Plaintiffs are outliers. The "majority rule" is that "prison inmates performing work in prisons are not employees for purposes of Title VII . . . since their work relationships arise from their status as inmates, the primary purpose of which is incarceration rather than employment." *Jones v. Lockett*, No. CIV.A 08-16, 2009 WL 2232812, at *5 (W.D. Pa. July 23, 2009); *see also McCaslin v. Cornhusker State Indus.*, 952 F. Supp. 652, 656-57 (D. Neb. 1996) (the "prisoner does not enter into a bargain with the prison to become a prisoner in order to be able to work in the prison industries, as might a private individual who contracts with an employer"); *West v. Goord*, No. 05-CV-447-FPG, 2017 WL 3251253, at *16 (W.D.N.Y. July 31, 2017) ("Federal courts have repeatedly held that Title VII, an employment discrimination statute, does not apply to inmates who are assigned to prison jobs.") (collecting cases).

With respect to the Rehabilitation Act, a key factor is whether or not a defendant received federal funds. *See* Mot. 19-20. Without a citation, Plaintiffs simply asset that they "disagree and, more importantly at this stage, have alleged facts which if proven true would subject Defendant to coverage under the Act." Resp. 21. That is not the standard. Plaintiffs must allege facts that plausibly state a

9

claim upon which relief may be granted. As GEO has explained, *see* Mot. 19-20, the authorities hold that a detention contractor does not receive federal funds merely by receiving payment under the contract. And in any event, GEO operates the Facility under a contract with IDOC, not the federal government. In the Complaint's section entitled "FACTS," there is no allegation that GEO receives federal funding to operate the Facility. Paragraph 36 refers to GEO "as a recipient of federal financial assistance," but provides no supporting factual allegations to enable the Court to conclude that this can be proven with respect to the Facility. The Court has no plausible basis on which to allow Plaintiffs to proceed with their Rehabilitation Act and claim, and should dismiss it.

## IV. PLAINTIFFS FAIL TO STATE PLAUSIBLE STATE LAW TORT CLAIMS.

Finally, in a last-ditch attempt, Plaintiffs cites pages of general tort law principles, but they attempt to defend their four separate claims in less than a page. *See* Resp. 24-25. None of these efforts support the plausibility of their claims.

*False Imprisonment.* Plaintiffs argue that "Defendant may still unlawfully imprison an individual, just as any officer of the law may." Resp. 24. But this is simply an argument that the Plaintiffs' confinement is improper. As noted, such a challenge should be brought as a habeas claim, not a civil action. *Alexander*, 2010 WL 4723435, at *1-2 (citing *Muhammad*, 540 U.S. at 750). There is no allegation that Plaintiffs were arrested without probable cause. Resp. 21. Plaintiffs cite no case in which a state prisoner has successfully brought a claim for false imprisonment against the private operator of a facility housing state inmates. Furthermore, Plaintiffs and other inmates are in the custody of IDOC, which determines when and where they will go, as directed by statute. GEO lawfully receives transfers and houses prisoners pursuant to IDOC's direct statutory authority. Ind. Code § 11-8-3-1; *see* Mot. 21.

*Confinement*. Plaintiffs contend their claim arises under the Crime Victims Relief Act. Resp. 22. Unsurprisingly, Plaintiffs identify no case in which a state prisoner has successfully brought a claim for criminal confinement against the private operator of facility housing state inmates. To the extent GEO "confines" any prisoner at the Facility, it does so under the lawful direction of the prisoners' custodian IDOC, and the appropriate remedy is to seek habeas relief against IDOC. And if a contractor lawfully

carrying out its contract with IDOC would become civilly or criminally liable within the scope of this statute by carrying out such contractual obligations with the State, then it is void as unconstitutionally vague. *Healthscript, Inc. v. State*, 770 N.E.2d 810, 815-16 (Ind. 2002) ("[T]he void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").

  *Unjust enrichment*. As a preliminary matter, the Complaint is so unclear on this point that GEO cannot discern what the Plaintiffs' unjust enrichment theory is, other than the conclusory allegation that GEO "obtained the value of their labor in detriment to and at the expense of these laborers." Comp. ¶ 39. There is no allegation supporting what the "value" of such labor is, or why it would be just for prisoners to expect such value for performing routine housekeeping tasks that they may be required to do under state law. Plaintiffs cite *Menocal*, 113 F. Supp. 3d at 1134, which permitted an unjust enrichment claim for participation in the federal Voluntary Work Program in a civil immigration detention facility to survive a motion to dismiss. However, that decision has not yet received any appellate review on the merits. It was wrongly decided, because detainees (as well as prisoners) have no reasonable expectation of receiving the minimum wage sought by those plaintiffs, and GEO had no expectation of being required to pay a minimum wage to immigration detainees. *See* Mot. 22 (noting that expectation of payment is required element of unjust enrichment).

  A better guide is a decision that has received appellate review. In *Whyte v. Suffolk Cty. Sheriff's Dep't*, 86 N.E.3d 249, 2017 WL 22746182017 (Mass. Ct. App. 2017), a Massachusetts court of appeals affirmed the dismissal of a similar unjust enrichment claim brought by an immigration detainee who participated in the facility's work program. The court of appeals held that "[a]bsent some factual allegation that he reasonably expected compensation at a higher rate, and the defendants accepted the benefit of his labor with actual or chargeable knowledge of his expectation, the complaint fails to state a claim for quantum meruit or unjust enrichment." *Id*. at *2. Plaintiffs make no allegations that they and GEO had some unfilled expectation of a wage-like payment for "the value of their labor." Nor would

11

such an expectation have been reasonable. *See Worsley v. Lash*, 421 F.Supp. 556 (N.D. Ind. 1976) (state prison inmate had no constitutional right to a minimum wage for work performed by him as a trustee in a criminal detention ward at a hospital where inmates of state prison were hospitalized); *Williams v. Indiana Dep't. of Corr.*, 702 N.E.2d 1117 (Ind. Ct. App. 1998) (prisons do not enter into a contract for hire with the prisoners they supervise); *see also Bennett*, 395 F.3d at 410 (explaining why prisoners have no employment relationship with government or privately-run prisons under FLSA).  As described above, Indiana has specifically provided that prisoners may be required to perform housekeeping chores when instructed to do so.  Prisoners would have no reasonable expectation that they would receive as wages what Plaintiffs allege to be GEO's "profit."  There is no plausible claim for unjust enrichment.

*Negligence*.  Plaintiffs have burden to show what legal duty exists that would support a negligence claim, but all they do is recite general principles of negligence.  The Complaint alleges a "duty to them to prevent their exploitation and abuse," Comp. ¶ 39, but this cursory allegation does not allow GEO or the Court to discern the nature of the negligence alleged or whether any duty exists.  The Response identifies no authority in which a prisoner has prevailed on the Plaintiffs' theory (whatever it is).  Plaintiffs appear to suggest a claim of employment-based negligence, Resp. 23-24, but for reasons discussed above, there is no basis to claim that Plaintiffs or the putative class were GEO's employees.

## CONCLUSION

For the foregoing reasons, Plaintiffs' class action complaint should be dismissed in its entirety.

Respectfully submitted,

/s/   Adam G. Forrest
Adam G. Forrest, Atty. No. 23920-89
BBKCC Attorneys
27 North 8th Street
Richmond, IN  47374
Tel: 765.962.7527
Email: afforest@bbkcc.com

Attorney for Defendant, The GEO Group, Inc.

## CERTIFICATE OF SERVICE

      I hereby certify that on the 7th day of February, 2018, a true and complete copy of the foregoing document was filed electronically using the Court's CM/ECF system. Notice of this filing will be sent to the following parties by that system:

David W. Frank
809 South Calhoun Street, Suite 400
Fort Wayne, IN 46803-2307
Tel: (260) 424-0600
Fax: (260) 424-0712
dfrank@myers-law.com
Counsel for Plaintiffs

                                              /s/ Adam G. Forrest