UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAMARCUS FIGGS, et al. )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>GEO GROUP, INC., )<br>)<br>Defendant. ) | No. 1:18-cv-00089-MPB-TWP |

**ORDER ON MOTION FOR LEAVE TO FILE AMENDED CLASS ACTION
COMPLAINT AND MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Plaintiffs' *Motion for Leave to File Amended Class Action Complaint* (Docket No. 54) and on Geo Group, Inc's ("GEO") *Motion for Summary Judgment* (Docket No. 42), which is based on the named Plaintiffs' failure to exhaust their administrative remedies available to them. GEO's motion for summary judgment will be **GRANTED**. Plaintiffs' motion for leave to amend will be **DENIED** as the proposed amended complaint does not solve the exhaustion issues and is untimely.

GEO contracts with the Indiana Department of Correction ("IDOC") to operate the New Castle Correctional Facility ("NCCF"), a state prison in New Castle, Indiana. Ind. Code § 11-8-3-1. NCCF includes a Mental Health Unit ("MHU") that can house approximately 100 prisoners. Plaintiffs are state prisoners who allegedly have been housed in the MHU for periods of time since 2014-2015. (Docket No. 1-1 at ECF p. 8, ¶¶26–28). On December 13, 2017, Plaintiffs and proposed class representatives Damarcus Figgs and David Corbin filed a class action complaint in the Henry County Circuit Court asserting claims against GEO for labor trafficking, discrimination, cruel and unusual punishment, false imprisonment, confinement, unjust

enrichment, and negligence. (Docket No. 1-1). The matter was removed to this Court on January 11, 2018. (Docket No. 1). In ruling on GEO's motion to dismiss, the Court permitted three claims to move forward: (1) a claim that GEO coerces Plaintiffs and other prisoners at NCCF MHU to labor, allegedly in violation of the federal Trafficking Victims Protect Act ("TVPA"), 18 U.S.C. §§ 1589(a), 1595(a); (2) a derivative claim that GEO recruits, harbors, or restrains Plaintiffs and other prisoners at the MHU in order to subject them to servitude, also allegedly in violation of the federal TVPA, 18 U.S.C. §§ 1590(a), 1595(a); and (3) a claim that GEO allegedly reaps unjust benefits from prisoners' labor during their incarceration at the MHU. (Docket No. 31).     In its answer GEO included the affirmative defense that Plaintiffs failed to exhaust their remedies before filing suit, as required by the Prison Litigation Reform Act ("PLRA," codified at 42 U.S.C. § 1997e) as to the federal claims and by state law with respect to the state claims. (Docket No. 32 at ECF p. 7). The Court ordered expedited briefing on these threshold defenses. (Docket No. 41).

## I.   MOTION FOR SUMMARY JUDGMENT

GEO's *Motion for Summary Judgment* is fully briefed. (Docket No. 42, Docket No. 51, Docket No. 55). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* If no reasonably jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court views the facts in the light most favorable to the non-moving party and all reasonable

inferences are drawn in the non-movant's favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).

### a. Facts

This statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to the Plaintiffs as the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Jennifer Smith was the Offender Grievance Specialist at NCCF at all times relevant to this motion. (Docket No. 44-3 at ECF pp. 3–4; Docket No. 44-16 at ECF p. 1). Smith was responsible for tracking all offender grievances by entering both the grievances and the institution's responses into NCCF's Offender Grievance System. (Docket No. 44-3 at ECF p. 4; Docket No. 44-16 at ECF p. 3). She was the custodian for these grievances and the responses to those grievances and any appeals filed by prisoners. (Docket No. 44-16 at ECF p. 3).

An offender must take three steps to exhaust NCCF's grievance process: (1) seek informal resolution; (2) file a formal grievance; and (3) file an appeal of any adverse ruling on the grievance. The offender seeks an informal resolution by contacting staff to discuss the policy or incident subject to the grievance. (Docket No. 44-3 at ECF p. 4; Docket No. 44-16 at ECF p. 3). If informal resolution does not satisfy the offender, his second step is to submit a formal grievance to the Grievance Officer of the facility where the incident occurred. (*Id.*). A formal grievance is subject to several requirements, including: (1) it must be limited to the same issues the prisoner raised through the informal process; (2) it must relate only to one event or one issue; and (3) it must explain how the event or issue affects the prisoner himself. (Docket No. 44-3 at ECF p. 18). If the offender is not satisfied with the resolution of his formal grievance, he must

submit an appeal. (Docket No. 44-3 at ECF p. 4; Docket No. 44-16 at ECF p. 3). The grievance process is complete once a prisoner finishes an appeal and complies with the timing requirements for each step. (Docket No. 44-16 at ECF p. 4).

Prisoners may file grievances on a variety of issues including, of relevance here, to challenge any of the policies relating to facility cleanliness, prisoners' rights and responsibilities with respect to chores or other tasks, prisoner payment, prisoner discipline, the use of restraints, or any other policy with which they take issue. (Docket No. 44-16 at ECF p. 4). Likewise, prisoners may use the grievance process to challenge the application of any of these policies by NCCF personnel. (*Id.*). Classification and transfer decisions, however, are made by treatment personnel and therefore must be appealed through a separate process, as stated in the Offender Grievance Process Manual. (Docket No. 44-3 at ECF p. 5; Docket No. 44-16 at ECF p. 7).

Smith reviewed the records for all grievances that Figgs and Corbin filed while housed at the Facility. (Docket No. 44-16). Smith's search revealed that Figgs and Corbin filed a total of seven grievances while incarcerated at NCCF.[1]

With regards to Figgs, on June 25 or 26, 2017, Figgs submitted State Form 52897 "Offender Complaint-Informal Process Level." (Docket No. 44-9 at ECF p. 8, Docket No. 52-1). Figgs complained that he had been housed in the MHU for two years, had successfully completed the program on three different occasions, and had filed a classification appeal, which

---

[1] Figgs has been housed at MHU in NCCF during the following dates: July 31, 2015 to December 12, 2018, and March 3, 2019 to the present. (Docket No. 44-16 at ECF p. 4). Corbin was housed at the MHU in NCCF from September 16, 2014 to March 20, 2019. (*Id.*). GEO separates these seven grievances into two sub-groups: (1) proper grievances (i.e., those alleging "grievable" issues) and (2) improper grievances (i.e., those alleging "non-grievable" issues). As the Court will explain, for the purposes of this case it is not relevant that some of the grievances raised non-grievable issues. Thus, the Court will not refer to the grievances in these two, separate categories.

4

had been denied. He asked that the matter be investigated. (*Id.*). On July 21, 2017, staff responded that Figgs would be released from the program based on his progress. (*Id.*). On July 28, 2017, Figgs lodged a disagreement with the result and filed a formal grievance. (Docket No. 44-9 at ECF p. 7, Docket No. 52-2). Figgs marked the date of incident on the formal grievance form from January 2016 to January 2017. The formal grievance stated:

> I've been housed here at N.C.C.F. Mental health unit for the last two years. Yes I've attempted suicide and had suicidal gesture out of my two years here. However there have been many of times where I have went 90 days without any suicide attempts or gestures. The highest phase in this program is phase three. I have successfully completed this program on three different occasions by making phase three and I've yet to be staffed out which means plans to transfer me to a step down mental health facility. Just this year I went 90 days without harming myself or others, no suicide gestures and went to groups and participated in therapy and still wasn't staff out. (Mar 29, 2017-June 29, 2017). All of what I'm saying is somewhere in my mental health records I'm assuming. My concern and complaint here is that I've completed this program several times and they still haven't transferred me out of mental health. I already filed an informal which I received a response from Stacey Scott which is attached to this.

(*Id.*). Smith returned Figgs's grievance as insufficient because: (1) it was submitted too late; (2) facility transfers and bed moves are not grievable; and (3) there was no specific date of incident. (Docket No. 44-9 at ECF p. 6, Docket No. 52-3).

Figgs had two other grievances, but neither was exhausted before the Complaint was filed. (Docket No. 44-16 at ECF p. 5). Complaint #100035 was not exhausted until February 27, 2018, and made several claims, including: (1) that there were "tremendous issues that are occurring on the [MHU] that are in violation of the American Disability Act"; (2) that prisoners were "suppose to receive 10 hours of group [therapy] per week" but that prisoners were not receiving that much time; (3) that Figgs's and other prisoners' "safety and security is being put at risk on a daily basis because mental health suppose to be staffed with at least 12 officers but on

5

days there are only 8 or 9" and that such staffing "is a safety violation because if something happens the GEO Group, inc is liable"; (4) that prisoners were "being held on the [MHU] that do not pose a risk to themselves or others" and that Figgs himself was "one of those offenders"; (5) that GEO was "profiting off us offenders because we can be at another prison at a step down mental health or population"; and (6) that "[d]ue to GEO has a contract with I.D.O.C. all three companies are violating [Figgs's] rights." (Docket No. 44-5). Figgs's Complaint # 101265 was not exhausted until May 4, 2018, and related to Figgs's preference to be assigned to a different psychologist. (Docket No. 44-6; Docket No. 44-16 at ECF p. 5–6).

With regards to Corbin, on September 26, 2016, Corbin submitted a formal grievance that complained of his sergeant escort assignment and requested that he be relieved of the escort assignment. (Docket No. 44-15 at ECF p. 9, Docket No. 44-16 at ECF p. 7). This formal grievance was denied on November 10, 2016, because there was no indication the Corbin tried to resolve the grievance informally. (Docket No. 44-15).

On August 17, 2017, Corbin submitted his informal grievance complaining that he had been on the MHU for thirty-five months and caused no problems, yet he had not been permitted to phase up and fully participate in the program. (Docket No. 44-15 at ECF p. 8, Docket No. 52-4). He concluded that he "feel[s] like a commodity being held here for [the NCCF Warden's] profit." (*Id.*). GEO responded to the informal grievance noting "all promotions are determined by the treatment team." (Docket No. 44-15 at ECF p. 8). On August 28, 2017, Corbin filed a formal grievance. (Docket No. 44-15 at ECF p. 7, Docket No. 52-5). Corbin's lengthy, formal grievance focuses on the nearly three years that he has been on sergeant escort and not allowed to advance in the program, despite the treatment/unit team's request. (*Id.*). On September 6, 2017, Smith

6

returned Corbin's grievance as a non-grievable classification issue. (Docket No. 44-15 at ECF p. 6, Docket No. 52-6).

Corbin also had two other grievances while he was incarcerated at NCCF, but neither were appealed. (Docket No. 44-16 at ECF pp. 6–7). Complaint # 102667, unexhausted, related to a confiscated letter. (Docket No. 44-11). Complaint # 103202, unexhausted, related to a broken intercom. (Docket No. 44-12).

**b. Analysis**

The PLRA requires any prisoner to exhaust all of his administrative remedies *before* filing any federal claim the relates to prison conditions. "No action shall be brought with respect to prison conditions under . . . any . . . Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002). In other words, it applies to all suits "about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532. The PLRA also applies to suits against "[p]rivately owned and operated facilities" unless their sole connection to a state arises from licensure or funding. *Cf.* § 1997(2).The PLRA requires prisoners to "exhaust all 'available' remedies" and requires courts to dismiss unexhausted claims. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006). This gives institutions "time and opportunity to address complaints internally," which could "obviat[e] the need for litigation" or "filter out some frivolous claims." *Porter*, 534 U.S. at 525. At minimum, the exhaustion requirement "facilitate[s]" adjudication by producing "an administrative record that clarifies the contours of the controversy." *Id.* In light of that purpose, the PLRA's exhaustion requirement is a

"precondition to *suit*" and not just a "precondition to judgment." *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 534–35 (7th Cir. 1999) (emphasis in original).

Prisoners must follow all procedural rules and deadlines in completing the prison grievance process before filing suit in order to satisfy the PLRA. *Woodford*, 548 U.S. at 90. This includes all available appeals. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). Administrative remedies are "available" under the PLRA even when a specific remedy sought (i.e., money damages) is not available. *Woodford*, 548 U.S. at 85. And the grievance process must be completed—not merely started—before the prisoner may file suit. *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). If a prisoner completes the grievance process, his claims are limited to those issues that were adequately identified in his exhausted grievances. The level of detail required to meet the standard may be established in the grievance procedure itself, but at minimum it must at least "alert[] the prison to the nature of the wrong for which redress is sought." *Strong v. David*, 297 F.3d 646, 649–50 (7th Cir. 2002); *see also Hall v. Lunsford*, No. 1:17-cv-2945, 2019 WL 1077600, at *5 (S.D. Ind. Mar. 6, 2019).

Although the PLRA's exhaustion requirement applies only to federal claims, Indiana courts apply an essentially similar analysis to prisoners' state-law claims. That rule arises from Indiana's general requirement that all claimants exhaust their administrative remedies before seeking relief in a court. *E.g.*, *Austin Lakes Joint Venture v. Avon Utils., Inc.*, 648 N.E.2d 641, 644 (Ind. 1995). This requirement applies to prisoner complaints. *Higgason v. Lemmon*, 818 N.E.2d 500 (Ind. Ct. App. 2005) (holding prisoner complaint alleging various state-law claims was subject to an exhaustion requirement separate from the one imposed by the PLRA). *Id.* at 502–03. Indiana courts have routinely applied this rule to dismiss unexhausted prisoner claims. *See, e.g.*, *D.S. v. M.C.*, No. 33A05-1602-PO-246, 2016 WL 3018052 (Ind. Ct. App. May 25,

8

2016) (upholding dismissal of state-law claim against New Castle employee for failure to exhaust); *Adams v. ArvinMeritor, Inc.*, 48 N.E.3d 1, 10–12 (Ind. Ct. App. 2015), *vacated in part on other grounds*, 60 N.E.3d 1022 (applying a "similar analysis" to both federal claims and state tort claims and affirming dismissal of state tort claims for failure to exhaust); *Justise v. Huston*, No. 77A01-1009-MI-511, 2011 WL 486576 (Ind. Ct. App. July 1, 2008) (state claim properly dismissed for failure to exhaust administrative remedies).

GEO argues that the evidence shows that the grievance process was available to Plaintiffs for complaints regarding any work, discipline, or payment policies that underlie their TVPA and state-law unjust enrichment claims, as well as any conduct by GEO personnel that Plaintiffs might allege was "coercive" in violation of the TVPA. (Docket No. 43 at ECF p. 12; Docket No. 44-16 at ECF p. 3). GEO asserts that Figgs and Corbin's grievances were either not exhausted at all, not exhausted prior to the filing of the suit, or raised issues that were not properly grievable nor related to the underlying problems alleged in Plaintiffs' complaint. (Docket No. 43 at ECF p. 12–17). Plaintiffs argue that they did not have an available remedy to exhaust their federal or state law claims. (Docket No. 53 at ECF p. 10–14). Plaintiffs concede that the PLRA applies at the summary judgment stage. (Docket No. 53 at ECF p.1).

"The TVPA criminalizes obtaining labor through threat of force or restraint, and Plaintiffs allege that inmates at the MHU 'are routinely chained and shackled when working' and 'long hours of isolation may be extended for weeks when a class member objects to the conditions of the [MHU] or suffers injury due to the harmful conditions of the environment.'" (Docket No. 31 at ECF p. 10, *quoting* Docket No. 1-1 at ECF p. 8). The Court previously held that this "language clearly alleges a scheme whereby Plaintiffs are required by force and physical

9

restraint to work and are threatened with serious harm—long hours of solitary confinement—if they refuse to work." (Docket No. 31 at ECF p. 10).

To recover for unjust enrichment, a plaintiff must show that (1) he rendered a measurable benefit to the defendant at the defendant's express or implied request; (2) he expected payment from the defendant; and (3) allowing the defendant to retain the benefit without restitution would be unjust. *Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012). The Court previously held that Plaintiffs adequately alleged an unjust enrichment claim because they alleged "that because of their labor GEO received a measurable benefit . . . and that a failure to compensate them would be unjust." (Docket No. 31 at ECF p. 21).

Thus, in order for Plaintiffs to satisfy exhaustion as to both their TVPA and their unjust enrichment claims they must have a fully exhausted grievance that put GEO on adequate notice that Plaintiffs believed NCCF's work requirements, discipline, or payment policies were inadequate or that the conduct of the GEO personnel was coercive.

The evidence shows that Figgs's #100035 grievance, exhausted on February 27, 2018, and #101265 grievance, exhausted May 4, 2018, were neither exhausted prior to the filing of this case nor do they have anything to do with the remaining claims. (Docket No. 44-4; Docket No. 44-16 at ECF pp. 5–6). One grievance alleged that his therapist had not complied with his treatment plan. (Docket No. 44-6) The other grievance alleged "tremendous issues" at NCCF that allegedly violated the Americans with Disabilities Act, insufficient group therapy time, and safety risks from understaffing. (Docket No. 44-5). Figgs further explained in his appeal that his safety concerns related to an "8th Amendment 'failure to protect.'" (Docket No. 44-5 at ECF p. 16). Similarly, the evidence shows that Corbin's #102667 grievance, which was unexhausted, and #103202, which was also unexhausted, were not even filed (let alone exhausted) prior to the

10

filing of this case nor do they have anything to do with the remaining claims. (Docket No. 44-10; Docket No. 44-16 at ECF pp. 6–7). One grievance alleged a confiscated letter (Docket No. 44-11) and one alleged a broken intercom (Docket No. 44-12).

These grievances were not properly exhausted prior to the filing of the suit nor do they relate to the remaining federal or state-law claims. Plaintiffs do not contest that conclusion in their response brief. (Docket No. 53). Instead, Plaintiffs argue that they tried to grieve their issues in their July 2017 and August 2017, formal grievances (and the informal grievances that preceded), but the administrative procedure was a dead-end, thereby relieving them of the exhaustion requirement. (Docket No. 53 at ECF pp. 9–14). *See Cotton v. Locke*, No. 1:18-cv-3909-TWP-DML, 2019 WL 3779714, at *2 (S.D. Ind. Aug. 12, 2019) ("[A]n administrative procedure is unavailable when it operates as a simple dead end, when it might be so opaque that it becomes, practically speaking incapable of use or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.") (citing *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016)) (internal quotation marks omitted).

As cited above, Plaintiffs challenge their inmate classifications and seek transfers in these two grievances. (Docket No. 44-9 at ECF p. 7; Docket No. 44-15 at ECF p. 7; Docket No. 44-16 at ECF pp. 7–8). Figgs's July 2017 grievance was returned on August 4, 2017. (Docket No. 44-9 at ECF p. 6). It was rejected because: (1) it was received too late, (2) it improperly concerns multiple issues or events, and (3), of most relevance, it "concern[ed] a Classification or Disciplinary Hearing issue or action. These types of issues or actions are to be appealed through their own appeal process and not through the grievance process." (*Id.*). Corbin's August 2017 grievance was returned on September 5, 2017. (Docket No. 44-15 at ECF p. 6). It was rejected

because it "concern[ed] a Classification or Disciplinary Hearing issue or action. These types of issues or actions are to be appealed through their own appeal process and not through the grievance process." (*Id.*). This aligns with the Policy and Administrative Procedures for the Offender Grievance Process, which provides that classification actions or decisions cannot be grieved using the Offender grievance process because "a separate classification appeals process is in place for this purpose." (Docket No. 44-3 at ECF p. 5).

Plaintiffs argue that these grievances seeking classification put Defendants on notice because "[a]t the heart of this Complaint is a question of why Figgs and Corbin, and the putative class they represent, were classified in such a way that they needed to be assigned to the [MHU] at [NCCF] for more than six months at a time. As a result of this classification, Plaintiffs were forced to provide labor and services to GEO." (Docket No. 53 at ECF p. 2). Thus, Plaintiffs argue, because Figgs and Corbin attempted, unsuccessfully, to grieve their classifications, the process was unavailable to them. The Court is not convinced that the "heart" of the remaining claims is the Plaintiffs' classifications. If Plaintiffs' classification grievances were sufficient "to alert prison officials to [the remaining claims]," then those same grievances would be sufficient for *any* alleged problems that Plaintiffs face at the NCCF MHU because but for their classifications they would not be housed in the MHU. *Jones v. Bock*, 549 U.S. 199, 219 (2007). This defeats the purpose of § 1997e(a) and state law's exhaustion of administrative remedies requirement because prison officials would not necessarily be afforded the opportunity to remedy the problem before it became the subject of litigation.

The only conceivable connection between Plaintiffs' grievances and their remaining claims lie in Figgs's single, vague comment that GEO is "profiting" off of prisoners and in Corbin's statement in his informal complaint that he felt like a "commodity" for New Castle's

12

Warden. (Docket No. 44-5 at ECF p. 3, Docket No. 44-15 at ECF p. 7). But, these comments must be read in context to determine whether they adequately apprise GEO of any of the problems raised in this complaint. *See Lovelace v. Yepsen*, 2016 WL 1660492, at *5 (N.D. Ill. Apr. 26, 2016). And in context, Figgs's comment plainly refers to his claim that he should be transferred to "a step down mental health or population" because he did not "pose a risk to [himself] or others." (Docket No. 44-5 at ECF p. 3). Likewise, Corbin's comment related to alleged discrimination because of Corbin's mental illness, and his subsequent formal grievance made clear that he was actually challenging his sergeant escort, which was allegedly preventing him from participating in the mental health program. (Docket No. 44-15 at ECF p. 7). Neither comment was accompanied by any mention of forced work, labor, or any benefit Plaintiffs may have conferred on GEO that would alert GEO as to the issues in this lawsuit, nor did either mention any payment policies or practices.

These two grievances that Plaintiffs solely rely on identified no instances of any labor, coercion, or inadequate pay. Nor did Plaintiffs' grievances identify any policies that might relate to any of those issues. Thus, whether these two grievances raised grievable issues is moot as the grievances did nothing to alert GEO that Plaintiffs felt that they had ever been coerced to labor, that GEO benefitted from any such forced labor, or that GEO had somehow unjustly benefitted as a result. Plaintiffs' grievances—whether proper or not—did not exhaust Plaintiffs' administrative remedies for the only claims they are now pursuing. Similarly, Plaintiffs' argument that the appeals process for Classification issues was "unavailable" because the Offender Inmate Grievance Process Handbook does not offer guidance on how or where to appeal classification issues is not an issue the Court need address today given Plaintiffs' grievances regarding classification did not adequately put GEO on notice and give it an

opportunity to address the issues remaining in the instant Complaint prior to the litigation being filed.

Plaintiffs argument that the grievance process was "opaque" is unconvincing. (Docket No. 53 at ECF pp. 9–12). The court in *Cotton* addressed the very grievance process at issue in this case and held that it was not unavailable when a prisoner had been "informed of the grievance policy when he arrived at [the correctional facility]." *Cotton*, 2019 WL 3779714, at *2. Plaintiffs have admitted their own familiarity with the same policy. (Docket No. 44-8 at ECF p. 3, Docket No. 44-14 at ECF p. 3). Further, the Court in *Cotton* held that the plaintiff had not exhausted his administrative remedies when he had filed another grievance near the time of the incident underlying his legal claim, but that grievance related to a "separate incident" involving the same defendants. *Cotton*, 2019 WL 3779714, at *2. Plaintiffs face a similar predicament: they filed several grievances relating to other issues, but they filed none relating to the alleged labor, coercion, or pay that underlie their current legal claims. Thus, Plaintiffs argument that the deadlines and other requirements make the process, practically speaking, incapable of use is not supported by the evidence, which shows that both Plaintiffs routinely used the grievance process for other issues, unrelated to this litigation.

Finally, Plaintiffs make an alternate argument, pursuant to Fed. R. Civ. P. 56(d), that the Court defer its decision on this motion until it can consider the facts set forth in their *Motion for Leave to Amend Class Action Complaint* (Docket No. 54), which Plaintiffs argue will eliminate the PLRA's applicability and moot any arguments about exhaustion. Plaintiffs, however, are mistaken that an amended complaint could moot the exhaustion requirement in this matter.[2]

---

[2] Plaintiffs' argument is also procedurally improper. The Seventh Circuit has held that relief under Rule 56(d) must be supported by a formal affidavit or by an unsworn declaration made under the penalty of perjury. *Kallal v. CIBA Vision Corp., Inc.*, 779 F.3d 443, 446 (7th Cir.

It is undisputed that Plaintiffs failed to exhaust their available administrative remedies as required by the PLRA before filing this lawsuit. Geo Group, Inc's ("GEO") *Motion for Summary Judgment* (Docket No. 42) is **GRANTED**. The consequence of these circumstances, in light of 42 U.S.C. § 1997e(a) and the remaining discussion, is that Plaintiffs' action should not have been brought and must now be dismissed without prejudice. *See Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004) (holding that "*all* dismissals under § 1997e(a) should be without prejudice.").

## II. MOTION FOR LEAVE TO AMEND CLASS ACTION COMPLAINT

On September 9, 2019, two months after GEO filed its motion for summary judgment, Plaintiffs filed their *Motion for Leave to Amend Class Action Complaint*. (Docket No. 54). GEO filed a response in opposition (Docket No. 56) and the period for briefing passed without a reply from Plaintiffs. Plaintiffs request leave to amend their Complaint to add/substitute Adolphis Goodwin, another inmate of the NCCF MHU and subject to the same mistreatment that Figgs and Corbin alleged in their complaint. (Docket No. 54 at ECF p. 2). Plaintiffs argue that Goodwin was released from prison on September 5, 2018; thus, the PLRA does not apply to him. (Docket No. 54 at ECF p. 2). GEO argues that not only is Plaintiffs' motion untimely, but also the PLRA and state-law exhaustion requirements still apply, and Goodwin cannot meet them; thus the proposed, amended complaint would be futile.

Federal Rules of Civil Procedure 15(a)(2) directs that leave to amend be given as justice requires, and courts have recognized a number of reasons for which leave should be denied. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Such reasons include, *inter alia*, futility, undue delay, and undue prejudice to the nonmovant. *Id.*; *see also Thompson v. Ill. Dep't of Prof'l*

---

2015); *see also* 28 U.S.C. § 1746 (requirements for unsworn declaration). Plaintiffs' provide a purported "declaration" that does not meet either standard. (Docket No. 51 at ECF p. 15).

*Regulation*, 300 F.3d 750, 759 (7th Cir. 2002). A court has wide discretion to deny leave to amend. *Kleinhans v. Lisle Sav. Profit Sharing Tr.*, 810 F.2d 618, 625 (7th Cir. 1987); *see also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisc., Inc.*, 991 F.2d 1249, 1257 (7th Cir. 1993) (decision denying leave to amend "will be reversed only if no reasonable person could agree with [it]").

Plaintiffs' motion is futile. Under the PLRA, a prisoner is defined as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). To determine whether a plaintiff is a "prisoner confined in jail," the Seventh Circuit explicitly requires courts to "look to the status of the plaintiff at the time he brings his suit." *Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004) (citing, *inter alia*, *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998); *Harris v. Garner*, 216 F.3d 970, 979–80 (11th Cir. 2000)). Thus, a former prisoner may avoid the PLRA "by waiting until his release from prison" to bring his claim. *Kerr*, 138 F.3d at 323. But if a prisoner is released while his claim is pending, the PLRA continues to apply. *E.g.*, *Harris*, 216 F.3d at 985.

Thus, Plaintiffs' proposed, amended complaint fares no better than their current one. It is well-settled that an amendment that replaces a putative class representative but otherwise leaves a claim unchanged relates back to the original-filed complaint and therefore was effectively filed at that time. *See, e.g.*, *Philips v. Ford Motor Co.*, 435 F.3d 785, 787–88 (7th Cir. 2006). Plaintiffs' own filings show not only that their proposed, amended complaint is on all fours with—and therefore, relates back to—their current one, but also that their intended putative class representative was incarcerated at the time that the current complaint was filed. (*Compare*

16

Docket No. 54-1 at ECF p. 8 ("Mr. Goodwin was sent to the MHU on or around October 24, 2017, and was forced to remain there until his release from prison on September 5, 2018") *with* Docket No. 1-1, filed on December 13, 2017). Consequently, Plaintiffs' intended putative representative is subject to the PLRA just as Plaintiffs are, *Witzke*, 376 F.3d at 750, and his subsequent release from prison is irrelevant, *Harris*, 216 F.3d at 985. His substitution for Plaintiffs therefore will not moot any arguments about exhaustion, as Plaintiffs claim.

Plaintiffs' entire argument as to amendment is that the PLRA does not apply to Goodwin. Plaintiffs have not even claimed that Goodwin exhausted his administrative remedies—even after GEO raised these issues in its response brief to which Plaintiffs failed to reply. For this reason alone, leave to amend can be denied. However, Plaintiffs are also incorrect that "vicarious exhaustion" principle means that their claim is no longer subject to the exhaustion requirement at all. Plaintiffs rely on *Meisberger v. Donahue*, 245 F.R.D. 627, 629–30 (S.D. Ind. 2007) for the proposition. Yet, in *Meisberger*, the Court addressed whether every class member needed to individually exhaust his administrative remedies to participate in an injunctive-relief class. 245 F.R.D. at 629–31. In that case, both of the class representatives had exhausted their administrative remedies by "present[ing] their grievances about the [relevant] policy," which meant that the facility "had the opportunity to review those complaints and respond." *Id.* at 629. The Court then reasoned that because the named plaintiffs had exhausted their administrative remedies, "it would [have been] wasteful to require each and every prisoner to present the same claim" to the facility. *Id.* at 630. The Court's holding in *Meisberger* comported with the PLRA's core purpose, which is to give a correctional facility "time and opportunity to address complaints internally" and therefore to reduce frivolous litigation and to improve the quality of the cases that do proceed to court. *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002).

Thus, the Court is not convinced that *Meisberger* extends to cover the scenario Plaintiffs present here. Unlike the Plaintiffs in *Meisberger*, Plaintiffs ask this Court to continue a case on behalf of a putative class—which they claim may include as many as a hundred current prisoners (Docket No. 54-1 at ECF p. 2)—without any prisoner exhausting his administrative remedies at any time. Really, what Plaintiffs seek is not "vicarious exhaustion," *cf. Meisberger*, 245 F.R.D. at 629–30, it is no exhaustion at all. *Meisberger* is further inapplicable given it involved an injunctive-relief class, whereas here the purported class seeks compensatory and punitive damages. In *Meisberger*, the Court explicitly noted that class-wide exhaustion presented a "largely academic" question in that lawsuit because the plaintiffs sought to invalidate a facility-wide policy on constitutional grounds, thus any order in their favor would apply to the entire prisoner population regardless of class certification. *Id.* at 630 n. 1. Indeed, the case on which *Meisberger* primarily relies found vicarious exhaustion appropriate for an injunctive-relief class only. *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004). For all of these reasons, at minimum, Plaintiffs' proposed, amended complaint is futile.

Even apart from its futility, Plaintiffs motion for leave is unduly delayed and prejudicial to GEO. District courts have wide discretion to deny leave to amend a pleading where there is evidence of undue delay and prejudice to the non-movants. While Plaintiffs assert that they first learned of Goodwin when researching their response to GEO's summary judgment motion (Docket No. 54 at ECF p. 2), there is no indication why Goodwin's information should not have been discovered by Plaintiffs earlier, specifically given this case was originally filed in December 2017. Moreover, the motion to amend was made more than two months after GEO filed its motion for summary judgment. The Seventh Circuit has previously held that when leave to amend is sought to avoid the defendant's pending summary judgment motion, there is no

trouble finding prejudice to the defendant. *Johnson v. Methodist Medical Center of Illinois*, 10 F.3d 1300, 1304 (7th Cir. 1993).[3]

In sum, Plaintiffs were aware of their need to exhaust their administrative remedies before filing suit—as evidenced by their allegations in the December 2017 operative Complaint that they had exhausted their administrative remedies. (Docket No. 1-1 at ECF p. 8–9). GEO's answer raised its exhaustion defense approximately five months before Plaintiffs sought to amend their complaint. (Docket No. 32 at ECF p. 9). Yet, despite being aware of the issues for months Plaintiffs did not file their motion to amend the pleadings until GEO's summary judgment motion had been pending for two months. The Seventh Circuit has found leave to amend properly denied when parties offered no explanation for their lapse. *Kleinhans*, 810 F.2d at 625–26.

Because Plaintiffs' *Motion for Leave to Amend Class Action Complaint* (Docket No. 54) is futile, unduly delayed, and prejudicial, it is **DENIED.**

### III.  CONCLUSION

GEO's *Motion for Summary Judgment for Failure to Exhaust Administrative Remedies* (Docket No. 42) is **GRANTED**. Plaintiffs' *Motion for Leave to Amend Complaint* (Docket No. 54) is **DENIED**. Final judgment in accordance with this Order shall issue at this time.

**SO ORDERED.**

Date: 12/12/2019

Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana

---

[3] The Court recognizes that the summary judgment stage in *Johnson*, which addressed the merits of the case, is distinguishable from the summary judgment in this PLRA action, which solely focuses on whether the exhaustion requirement has been met. However, under the facts of the instant case the Court finds that distinction insignificant given the futility of Plaintiffs' amendment and given the delay in proposing the amendment after the exhaustion issue of the currently-named Plaintiffs was raised.